Good morning. Good morning, and may it please the court. I'm Don Verrilli for Appellant Louis Sanft. I'd like to reserve three minutes for rebuttal, please. Okay, go ahead. Every count of Mr. Sanft's conviction should be reversed, or at least vacated, for three reasons. First, the government violated Brady by suppressing critical evidence that would have impeached a key witness. Second, the government impermissibly vouched for the credibility of that very same key witness. And third, the trial court refused to give a lesser included defense instruction that was clearly warranted on the facts and the law. I'm happy to address anything the court wants, of course, but if I could, I'd like to focus on the Brady violation because I think it goes to the fundamental lack of integrity of the proceedings below. Well, I know that you think the Brady is the most significant, and I think the party's probably spent the most time, but I want to make sure we leave time, and you can do that, but it's to the lesser included. Yes, I agree, Your Honor, that it's a serious question, and I don't want to slight it, and I will make every effort to address it. But if I could start with Brady, I would appreciate it. Sure, go ahead. With respect to Brady, now, the government has conceded, and this is at page 26 of its brief, that it was, in the government's own words, a serious error not to turn over the T visa application materials of Dennis Leva, the key witness. So the only question is whether the impeaching force of that suppressed evidence is sufficient to undermine the confidence in the verdict. The answer to that question is yes. Leva was, by far, the government's most important witness in this case, and the suppressed evidence showed two things. First, it showed that Leva had a powerful additional motive to do the government's bidding in order to gain a very substantial immigration benefit that the jury knew nothing about. And second, the evidence showed that Leva was a sophisticated manipulator. He told the immigration authorities one story that he needed to tell them, the blackmail story, in order to try to qualify under the trafficking provision for a T visa. And he came into court, and he told the jury a completely different story. So that contradiction is a second reason why there was a really powerful impeaching force to his testimony. Now,  the government described him as a vital witness? The government told the jury in closing that Leva's testimony alone established Mr. Sam's knowledge? Well, I guess... I don't think there's any doubt that Leva was important. And they did know that he had an illegal status. He ran when they tried to stop him. He got taken into custody, and they knew that he was trying to get the deal for himself so that he'd be able to stay here. I think the government's response to your... I don't think... Well, I can't say, but I think it's pretty clear he was important. I can't say what my colleagues think, but I think that it's pretty clear that you should have had that information. But the government says that even without Mr. Leva, there was sufficient evidence to convict Mr. Sam. And there were other witnesses that testified that added to putting some nails in the coffin for your client. So could I make a couple of points about that? The first point may not sound like a direct answer to Your Honor's question, so I wanna assure you I will answer Your Honor's question directly. That's okay. But on the first point, I do think that with respect to the impeaching force of this evidence, I would point the court to the Coring decision. And if I could, I just wanna quote something from Coring, and this is at page 904 of 637 F3rd, that... I think essentially with respect to this evidence, one of the two things the government says is, well, it's cumulative. And as Your Honor was averting to, he was already impeachable for other grounds. But what Coring says is that evidence is not... Impeaching evidence is not cumulative if it sheds light on the magnitude of the witness's incentive to cooperate, and if it would have revealed that he had much more at stake than was already known to the jury. That's exactly true here, 100% true here with respect to the incredible immigration benefit that he would have received had he gotten that T visa. Residency, work permit, glide path to permanent residency. So, Mr. Ville, is it enough for a witness to be a pretty important one and to have suppressed evidence that is important enough itself to add to the impeaching quality to it? Is that enough for materiality, or do we need to look at something else? Because I think the government would say there's still quite a bit of other evidence there as well. That was the second part of Judge Callahan's question, and I will address it directly now. With respect to that circumstantial evidence, the government has its six points thing, and I'll happily walk through each of the six points, but before I do that, I wanna make a prefatory point that if one's looking for knowledge from the circumstantial evidence, you gotta consider all of the evidence. What the government leaves out of that analysis is the trial evidence that showed that Mr. Samft had no motive to do what he was accused of doing here. First, he knew the county was monitoring the discharges, so he knew he would get caught if he ordered this. And now, what the government says is, well, but he didn't know the EPA was monitoring, but that doesn't matter. He knew the county was monitoring, and in fact, the way this whole thing happened is that the county's monitoring tipped off the EPA, and that's why they raided. And so he knew that. B, he had... The trial evidence shows he had no financial incentive to do this because the cost of paying Emerald to haul off the liquid was about the same as the cost of the overtime that he was paying to Mr. Leva. So it was awash financially, so why take this big risk when you know you're monitored and you're not saving any money? Well, I've been doing criminal law for a very long time, and just because people know that something's not a good idea has never seemed to stop a lot of people from committing crimes. So I'm not sure I find that persuasive. I mean, it would have... Wasn't there some evidence about he wasn't paying to have stuff hauled off or to some... Well, that's... Maybe I should just walk through the six points, and then we can try to deal with it. I mean, there is such thing as a stupid criminal, that people still do... They're always cutting corners. Of course, Your Honor, but the question here is, we know this was a serious error. The government's told us this. We know he was the key witness. We know that. I don't think there's any dispute about that. So the question here is whether this impeaching evidence was sufficient to undermine confidence in the verdict. And they are making this argument. They've made this argument as cumulative. I think I've addressed that. They're also making this argument that there's enough evidence here that the jury would certainly have come to the conclusion that... Well, there was Mr. Henderson, right? Well, let me walk through them all, okay? Mr. Henderson's testimony was that on one occasion, he saw Mr. Leva pumping something from a drum into the drain. On one occasion, didn't say what it was. He said it was on one occasion. Now, Mr. Samp,  Mr. Henderson, because Mr. Henderson was a recent employee and he had it in for Mr. Leva and was trying to get him fired because he thought he was lazy and cut corners. The other supposed evidence, direct evidence of discharge was John Samft. That, of course, was the defendant, Louis Samft. It was his own interviewed into EPA where he talked about what John had told him. And he said John told him that on one occasion, he saw hoses on the floor, okay? That is hardly compelling direct evidence that Mr. Samft knew that Mr. Leva was engaging in these discharges. Now, with respect to the other evidence to which the government points, they say, well, Mr. Samft put a cement cap over the drain, but it was a removable cement cap. He testified the reason for that was that he might wanna sell the property at some point. The future owner might want access to the drain. That's hardly conclusive evidence. They say that Mr. Samft gave conflicting stories about how the caustic water was disposed of. But I think if one reads his testimony, that's just not a fair description. There weren't conflicting... He wasn't talking about conflicting ways of doing it. It was a sequence. He said, look, here's what we did. At first, the first step was we boiled off as much of it as we could. That occurred in the latter part of the week. There was testimony that you could continue until you got down to about a third full of the tank. You could continue to clean drums in it. And then, with respect to the rest of it, that it was filtered, and then you recycled the water back into the tank, and you got rid of the sludge. And Emerald did continue to haul away sludge throughout this whole period. Even if it wasn't reflected in the business records? No, it was reflected in the business records, Your Honor. I think there's some confusion about this, and I just wanna clear up. The total volume of Emerald's hauling off went down over time. And at the beginning... But Mr. Sanff testified about this too. But they did haul off the sludge all the way through. They hauled less because Mr. Sanff initially was having them haul off the water and the sludge. He did that, the testimony in the record was he did that because he was trying to establish a business relationship with Emerald, so he wanted to give them more business because they could use his cleaning services. Eventually, over time, he realized it really wasn't worth it to do that, and he moved to this alternative method. That's all in there. And then I can go through the other six points too, but it's all the same. It's all quite indirect circumstantial evidence. There's nothing close to Leva's testimony in terms of establishing Mr. Sanff's knowledge. And so that's really important. And I do wanna... I wanna get back to why I think this impeaching evidence is so important. Not only does it show that substantial additional motive on Mr. Leva's part, but basically, Mr. Leva went to the immigration authorities and he made up a story about being blackmailed, because that's what he needed to do to try to establish that he was a victim of trafficking. But then he didn't tell that story to the prosecutors, to the EPA, or to the jury. He told them a totally different story. And that contradiction, what that shows you is that he would have been impeached on the ground, that he says whatever is in his advantage. It was in his advantage to tell the immigration authorities one thing, it was in his advantage to tell quite a different thing to the jury. And I do just... There's one thing I think is important. I just wanna point the court to it, about the implausibility of this blackmail story. In the post trial proceedings, we submitted declarations, and you can find them at 2 ER 269 to 81, from a host of people, including Mr. Leva's ex wife, who said this blackmail story was complete nonsense, that Mr. Samp treated Mr. Leva like a son for 18 years and covered all kinds of expenses. So if he tried to tell that blackmail story in court, he would have been shredded to bits. So I think his credibility would have been completely destroyed. Now, I will turn to the lesser included offense issue. Well, I guess if I frame the issue, and maybe you can do it on your rebuttal, because I'm gonna ask Ms. Miller about this, is, it would seem to me that having been a trial judge, there was evidence that your client put into evidence through his own testimony, and there were some other things, that his defense... He was saying, I didn't know. And there's a lesser included of negligence. And so in order to be a lesser included, it would be my understanding, if the greater offense does not require a mens re, that essentially it's a strict liability, then this isn't a lesser. That is not a lesser included, if that's the interpretation. That's their pitch, I think, in their brief. Well, but I guess it sort of seems pivotal to me. Yeah, it's pivotal, I agree. If the greater has no mens re, then I don't think negligence is a lesser. I can summarize in four points here why it is... It's just completely obvious that the greater has a mens re of knowledge. First, the text of the statute says that a responsible corporate officer, that's their strict liability theory, that responsible corporate officers are responsible corporate officers. The statute defines a... It says person means, among other things, responsible corporate officer. So it defines person as responsible corporate officer. And then it says, a person knowingly violates if blah, blah, blah. So the statutory text, which they really don't say anything about in their brief, unambiguously shows you that the responsible corporate officer has to have knowledge to violate it as a responsible corporate officer. Second, this Court's decision in Iverson, I think the key point on Iverson, just bear with me for a second. This is at page 1026 of the opinion. I think it would be helpful if I could just read you the Court's holding in Iverson. The Court goes on... The Court in Iverson is rejecting an argument that... Well, isn't the... Weren't they really fussing about who's the corporate officer in Iverson? Well, that's the key, right? So first they said that the argument in Iverson is a responsible corporate officer applies only if you're actually acting on your authority over the persons who violate the Clean Water Act. The Court in Iverson says, no, if you have the authority over them, then you're a responsible corporate officer. But that's the part the government likes. What the government doesn't deal with is the actual holding of the case, which is at page 1026. Okay? And it says what the holding of the case is that the responsible corporate officer instruction alleviated the government only of having to prove that the defendant personally discharged or caused the discharge. In other words, you could hold them responsible for the discharges as a responsible corporate officer. But then it says the government still had to prove that the discharges violated the law and that the defendant knew the discharges were pollutants. So it says they had to prove the responsible corporate officer's knowledge. And then the third point I want to make is look at the government's proposed jury instruction on this issue, which you can see was the jury instruction given, and it's at 1 ER 87. The jury instruction requires proof of Mr. Samp's knowledge to violate as a responsible corporate officer. Then look at the government's closing argument, which is at 12 ER 2926, where the government itself in closing argument says in order to hold Mr. Samp responsible as guilty as a responsible corporate officer, we have to prove that he had knowledge of the discharges. And of course, the government thought that the strict liability theory, which they're now advocating in their brief, were a valid basis. Of course, they were trying to get trial because it would have been 800 times easier for them to win a conviction if they didn't have to prove Mr. Samp's knowledge. So I just think I mean, I realize I'm over my time here, but I just think this argument that you can construe this statute as being a strict liability offense for responsible corporate officers has nothing to it. And so in your view, it's possible to construe a negligence charge on the basis of Mr. Samp didn't know about Leyva's dumping. Leyva may have been purposeful in the dumping itself. But if Mr Sampt was a responsible corporate officer and failed to supervise him enough or supervise the operations, he could be charged with negligence at trial. Yes, Your Honor. And I think because Mr Sampt testified and he testified that he didn't know, but there were a lot of circumstantial. There is some circumstantial evidence that this was going on. I think the that's the case. And I think I've explained quite clearly that the negligent negligent violation is a subset of an intentional violation because of the mens rea issue. The tests have satisfied. So under Arndt and Torres, he was entitled. That's what Arndt and Torres says, entitled. And does it matter that the jury did actually convict on a knowledge basis? Well, I think that that's going to be true in every lesser included offense case where the lesser included offense isn't given. And that's the whole point of a lesser included offense doctrine. Well, but I think the instructions also, my recollection of when I was a trial judge, you only get to the lesser if you acquit the person of the greater. Yes, but the so if they if they felt like that he had knowledge and they convicted him of the greater, how could they have gone to a lesser? Well, that, as I said, Your Honor, that's true in every lesser. Every case in which a lesser included offense instruction isn't given, what Your Honor just described, will be the case. And the point of the doctrine, as I understand it, is if you. Well, you don't get to pick, you don't, the jury doesn't get to pick what they want to convict someone of. The instruction, it says, if you find beyond a reasonable doubt that the person is not guilty of the greater, then you look at the lesser. But. Yes, but can I, if I could just make two points on that. First, as I understand this doctrine, the whole point of it is that in a situation in which those two elements of the test are satisfied, that they're, that the lesser is a subset of the elements of the greater, and there was evidence in the record from which a jury could have convicted, that the reason that, that what Arndt and Torres say that is that the defendant is entitled to an instruction is because if you put the jury to the all or nothing choice, either acquit the guy or convict him of the more serious offense, and they think something was bad, but it wasn't as bad, that there's going to be an incentive on their part to convict, to convict, so that, because they think he was guilty of something. That's the whole point of the doctrine, and that is what the cases say. And so, I do think that that, and that's exactly, I think, our situation here. Okay, we've taken you over, because I'm feeling so generous today. I'll give you two minutes for rebuttal. I appreciate your gratitude. I'm grateful for your generosity. Thanks. All right. Good morning. Good morning, Your Honors, and may it please the Court. I'm Teal Miller on behalf of the United States. Can you start with the, since, since I'm, I'm on the lesser-included offense, can you start there and then? Yes, Your Honor. Even though everyone wants to talk about Brady, I still want to talk about the lesser-included. Yes, Your Honor. You'll get to talk about Brady. I look forward to it. So, two points initially about the lesser-included offense question. The first is, this only goes to counts 2 through 30 of the conviction. That those were the only counts as to which Samt argued for this instruction. The second is that, ultimately, this is reviewed for harmlessness. There's a debate in this Court's cases about whether it's harmlessness or harmlessness beyond a reasonable doubt, but it is reviewed for harmlessness. And for the same reason that Mr. Samt can't satisfy the materiality standard under Brady and Giglio, this was harmless beyond a reasonable doubt. But, but getting to the issue of, what was the case argued before the jury that knowledge was required of the grader? So, there were three different, there were three different theories on which the jury could have, was instructed it could convict Mr. Samt on counts 2 through 30. One was aiding and abetting liability, to which there is no lesser-included offense. The second was as a responsible corporate officer, and the third was as a principal. What was the third? As a principal. Okay. If Mr. Samt had gone to the district court and said, I want a special verdict form that says, if you reject aiding and abetting liability, and if you reject responsible corporate officer liability, then I'm entitled to a special verdict form that says, consider both negligence and knowledge. But Mr. Samt didn't ask for that. What he asked for was a straight-up, unalloyed negligence instruction, which would have totally undermined the aiding and abetting instruction and the responsible corporate officer instruction. So the district court didn't abuse its discretion when it rejected the instruction he asked for. And why would it have undermined it? Because you can't On the corporate officer side, at least. Okay. So as to aiding and abetting, because you can't negligently aid and abet. Right. As to the responsible corporate officer, Iverson's understanding of what the responsible corporate officer provision of the Clean Water Act is doing is it is effectively imputing liability to someone who has the authority and control to stop the discharges and fails to do so. So if there is a lesser included offense to responsible corporate officer liability, it's not negligence. It's you had something less than authority and control. Well, imputing liability, so I'm a little skeptical of this argument, I'll admit. Imputing liability is a different thing than imputing a mens rea requirement. You know, and I think Mr. Verrilli's point that the plain language of the statute seems to support his view has some force in the way that the word person is defined in the statute itself to include a responsible officer. So I don't take Iverson to be a case that is ignoring the plain language. What it says is that the responsible corporate officer provision says person means in addition to the principal. In addition to is the key language here. It is expanding liability to someone who is in a position to stop it. Well, Iverson was not a mens rea case. That's right. So it was dealing with, as we were discussing earlier, how much, you know, do you have to have control over the specific activities or a more generalized authority over the operation itself? But where in that does it suggest that the corporate officer would not have to have any knowledge independent of what was going on with the dumping person? So as my friend says, in this case, the responsible corporate officer provision or instruction that was given did have knowledge. So the question, you know, we assumed a burden, I think, that was higher than we needed to. And I agree, actually, that page 1026 of Iverson is the key point. And what the Court said there was the Court also told the jury that in addition to a defendant who discharges or causes the discharge of pollutants directly, the Clean Water Act holds accountable responsible corporate officers, read together with the previous instruction, which is just the elements of the principal offense, the responsible corporate officer instruction relieved the government only of having to prove the defendant personally discharged or caused the discharge of the pollutant. So the key question is, how was this discharge done, knowingly or negligently? You can be charged either way. Here it was charged negligently. And there isn't a lesser included offense of negligent responsible corporate officer liability unless the discharge was negligent. But I don't want to use all of my time on this. So I do think, ultimately — Before you leave the point, is the knowledge the knowledge of the discharge or the knowledge of the conduct? Because I think the statute can be read to say it's knowledge of the discharge, not knowledge of whether it was negligent or deliberate. So here the jury was charged that Samt could be held liable as a responsible corporate officer if he was knowledgeable of the — if he knew about the discharge. Yes. So I think the way to get from this argument to the Brady and Giglio is materiality, which would also go to lack of prejudice here. And if I may, I want to turn to why, although the government made a serious mistake in failing to turn over the temporary file, the district court was correct that the information, the impeaching information in that file was not material. Well, part of your point is that it was cumulative. But I think it's a fair point to say the different stories were not cumulative of the impeachment that was engaged in a trial. Would you agree with that? So the different stories went to why Lavo was discharging, but not that he discharged and that he did it with Samt's knowledge. Correct. But if you could put on evidence that the witness has lied, then that's a fairly powerful cross-examination. Yes. It is a powerful cross-examination. And we conceded that this is favorable to Samt and that it is not cumulative. I don't think the district court's determination turned on it being cumulative. When the district court said that it wouldn't have changed Lavo's, the jury's view of Lavo, it didn't mean that this was not new. It meant that Lavo was already significantly impeached, which is true. Lavo testified he didn't ask for any immigration benefits. An agent testified that that wasn't true. That was significant impeachment of Lavo. And the jury was charged to view Lavo's testimony with caution. But stepping back from Lavo entirely. Well, can we stick with Lavo for a moment? And I'll let you, Ms. Miller, get to the broader picture. There is a big difference in my mind between what's presented to the jury as, well, we're deferring removal in order to testify here at this trial. And he says, I'm probably going to get deported after this, to the possibility in that he's actually applying for permanent, you know, staying here permanently in this country and the incentives that are aligned with that. Isn't that, I mean, that's certainly not cumulative. And isn't that a powerful difference that the defense could have applied to significantly undermine Lavo even more? So, again, we have conceded that this was new impeachment information and we have conceded that it was non-cumulative. We're just saying, given what the jury already knew about reasons to doubt Lavo's credibility, and given that they already knew that he had a reason to, that he was hoping for an immigration benefit. It doesn't outweigh all the other evidence of Sam's knowledge. That is totally independent of Lavo's testimony. And if I may, it is really significant in this case that the jury convicted Mr. Sampt of making a false certification in September of 2017 because that conviction shows that the jury disbelieved Louis Sampt's testimony, that he believed Lavo over when Mark Henderson told Sampt that he saw Lavo discharging caustic solution to the sewer. Now, my friend said this morning that Henderson was vague about what he saw. That is not correct. At 1927 of the record, Henderson testified that he saw Lavo discharging the caustic solution used to clean the tanks. So Henderson testifies. This is direct evidence of Sampt's guilt, of Sampt's knowledge. Henderson testifies, I told Sampt that Lavo was discharging. I saw him discharging caustic solution to the sewer. And Lavo did not seem angry or surprised, even though he told the EPA he would go crazy if he heard about anyone in his company discharging. And Henderson says that what Lavo did instead of going crazy was he did not seem surprised. He said he would talk to Lavo. Then the next day or the day after, he told Henderson, you didn't see what you thought you saw. He showed him the drain and said, look, there's a cap on it, which hadn't been there the day before. And Henderson felt betrayed, and he quit. And the jury credited that over Lavo's testimony or, sorry, Sampt's testimony that he believed Lavo. It rejected Sampt's explanation that he believed Lavo because it convicted Sampt of making a false certification from the period that month when Henderson saw that discharge. That conviction on count 31 shows that the jury disbelieved Sampt on a point totally unrelated to Lavo's testimony and credited Henderson. We have direct evidence of Sampt's knowledge, and it isn't ambiguous in the way that's just been suggested. Would you say that Henderson's testimony, apart from Lavo, is the best direct evidence of Sampt's knowledge apart from Lavo? So I also think Lavo's lies are direct evidence of consciousness of guilt, and the district court found that he committed perjury, his lies both to the EPA and on the stand. I'll tell you about another lie that Sampt gave on the stand. Lavo said, or Sampt, excuse me, I apologize for confusing the names. Sampt said, I knew I was being monitored because in September of 2018, I saw them installing the monitoring equipment between 10 and 10.30 p.m. The agent who installed the monitoring equipment said it happened between 3.30 and 6.00 a.m. That is a lie on the stand. That supports the district court's conclusion that Sampt was discredited, that the jury, totally apart from Lavo, believed that Sampt was lying, and lying is consciousness of guilt. In addition to that, we have monitoring data from three separate several-week periods showing that these discharges were happening regularly, and some of them were happening when there were lots of people at the facility. This was a very small facility. It was open. So the evidence about, you know, evaporation, maybe it would have worked, we don't need to know how Seattle Barrel was getting rid of its caustic solution through testimony. We know through scientific evidence that it was discharging it to the sewer. But that doesn't go to the knowledge side of it, I guess, right? I mean, you know, it does go to the knowledge side of it insofar as it was open at the facility during working hours. So we also have John Sampt's statement to the EPA that he told Lavo about discharging to the sewer. That's also direct evidence of Sampt's knowledge, totally independent of Lavo. And then we have Lavo, or Sampt's dissembling, both to the EPA and on the stand. And then we have the evidence from King County from 2013 and 2014 when Sampt gave implausible explanations to the county to try and account for discharges to the sewer. He's tried to explain why he didn't know, the EPA didn't, sorry, the county didn't know. Well, so those were, there were tests where there were high levels. Is that correct? There were tests for high levels in 2013 and 2014. That's with the county. And then in 2018 and 2019, there were three periods of monitoring by the EPA which showed regular discharges of the caustic solution to the sewer. So how did those relate to the convictions? So the conspiracy was charged beginning in 2009. So they related to the conviction in that they were within the conspiracy period. But they also showed knowledge because Sampt tried to explain those results, the these were discharges from his boiler. But there were two reasons why that was implausible. One was the boiler discharged train tracks behind the facility and the sewer was in front of the facility. The second was the boiler's pH level was never high enough and it was regularly tested to account for the level of pH in the discharges that the county found. So what was the situation at trial in terms of testimony about whether Sampt had hired anyone to take materials off and whether he was building something to clean things up? What was the testimony in that area? Okay. So those are two separate issues. One is about the wastewater treatment facility that he installed and one is about Emerald Services. As to Emerald Services, what the record shows was that Seattle Barrel sent sludge, toxic sludge, to Emerald Services throughout this period. But as to the caustic solution, so liquid, there were no shipments after 2015, even though the permit application signed by Sampt said that the way the company was getting rid of the caustic solution was by giving it to Emerald Services. As to the wastewater treatment facility, the record is uniform. The evidence was uniform that the wastewater treatment was never intended to process the caustic solution. It was installed maybe in reaction to the fines for the county, and Sampt did get a reduction in one of those fines for installing it, but it was never intended to handle the caustic solution. It was dealing with a separate problem. I think ultimately the problem with the view of the evidence that says, oh, we can't really tell if additional impeachment would have made a difference, is that there was  I think one of the things that's been suggested is that he didn't have a motive. At page 3034 of the record, the prosecutor argued the very motive that we described on appeal and that the reply brief suggests is made up on appeal, which is that it was operationally difficult to deal with these 250-gallon totes, which weighed 2,000 pounds. It was hard in a tight production facility to get rid of the caustic solution using Emerald Services. And he did have a motive, which is he needed to get rid of the caustic solution, and he didn't have a way to do it. In addition, I want to address there's a page or there's a line of argument from the prosecutor that Sampt has focused on, on appeal, which is if you find that Dennis Levo was sneaking around behind his back and he didn't know about it, you should acquit him on every count. And Sampt says, well, that shows that the government knew that this case turned on Levo's testimony. But if you read the full paragraph, that is not what the prosecutor was saying. This is at 317 to 318 of the record. The prosecutor says, did Louis Sampt know about the dumping? If you find that he knew about the dumping, you should convict him on every count. If you find Dennis Levo was sneaking around behind his back and he didn't know about it, you should acquit him on every count. The prosecutor was not acknowledging that Levo's testimony was the critical evidence of Sampt's knowledge. And it wasn't. There was abundant other evidence of that knowledge. And he wasn't talking about Levo's truthfulness at all. I think there are a couple other sort of suggestions of ambiguity in the record that could lead you to find that this wasn't material that I want to address. Since I took the, since we took Mr. Brewerly over, I'll allow you a little leeway here. So go ahead and do that if you can in the next two minutes. I'll do my best, Your Honor. They, in their briefing this morning, they said that Sampt told EPA about the hidden drain. He said at 515 of the record that there was only one connection to the sewer. So he denied that this drain was connected to the sewer, to the EPA. That denial is knowledge, is evidence of his knowledge. As I said, they say we failed to show that there was a motive, but actually we argued the very motive we're saying here. They say, you know, as to evaporation, our expert was extreme. But their expert testified that our expert's approach was actually very reasonable and they had no quibble with it. This is at 2424. As I said, Sampt's testimony that he knew he was being monitored because he saw the equipment being installed was discredited at trial. And I guess the what I'd say in summation is that speaking briefly about Leyva, the district court heard Leyva's testimony and was in a good position to understand sort of how it came across to the jury and noted specifically that Leyva was directly instructed at the request of the defense not to talk about immigration benefits. And in light of that instruction and in light of the fact that during the proffer, he did say that there were references to the fact that he was illegal, and he also said during his proffer that they were discouraged from seeking, when seeking medical attention for injuries on the job, they were discouraged from saying, they being the employees of Seattle Barrel, that they were injured on the job. Those things actually show that the district court reasonably assessed the likelihood that of this impeaching evidence on the jury. But ultimately, you know, our basic position is this was not material because Sampt would have been convicted without Leyva's testimony at all. We caught Leyva red-handed discharging to the sewer, so we knew what was happening. And the evidence of knowledge independent of Leyva's testimony that Sampt knew about it and paid him extra to do it was abundant. Okay. Thank you for your argument. We ask that the judgment be affirmed. Thank you. I'd like to address lesser-included offense and then Brady. On lesser-included offense, a few points. With respect to the question of whether there's a harmlessness analysis, look at Hernandez. It's basically just applying step two of the basic test of whether there's evidence in the record that would support a conviction on a lesser offense. If so, it's not harmless. So whether you look at it like Arndt does and say it's part of the test or look at it like Hernandez does and say that that's the harmlessness analysis, doesn't matter. You end up in the same place. With respect to the aiding and abetting counts, aiding and abetting requires intent to facilitate. So, of course, you had to prove his knowledge if you wanted to convict on aiding and abetting. On Iverson, again, just as in the briefing, my friend on the other side just ignores the sentence on page 1026, and I think he's trying to confuse the difference between who qualifies as a responsible corporate officer and what it takes to convict a responsible corporate officer. The text of the statute, which is reflected in their jury instruction and their closing and argument, shows it has to be knowledge. And with respect to the question of whether this only applies to counts 2 through 30 or all accounts, it's got to apply to all accounts because every single count, including count 35, false statement, required proof of knowledge. And if the jury thought that the jury convicted him of only negligent violation of the Clean Water Act in 2 through 30, then, of course, it wouldn't have convicted him of knowledge on the others. Or at least there's a sufficient reason to think that that would be true, and that takes down every count in the case. Now, with respect to Brady, if I could, we'll start with Mr. Henderson, first of all. I think it's important to understand this is a subtle distinction, but it matters. Mr. Henderson testified, as my friend said, that on this one occasion, he saw Leva dumping the caustic solution, but he also testified that what he told Mr. Samft, and this is at page 1927, was that he saw Leva pumping something down the drain. It doesn't say what it was. And that's what matters with respect to Mr. Samft's knowledge. Now, beyond that, I think the basic—why I don't think you can consider Henderson independently of Leva is that, well, you know, of course, if the jury believed Mr. Leva, then of course they're going to believe Mr. Henderson. But if they disbelieved Mr. Leva, that might well have affected the way they thought about Mr. Henderson's testimony, and whether to believe Mr. Samft over Mr. Henderson in terms of what he understood there. Now— Well, didn't Mr. Henderson, though, then, when he told it to Mr. Samft, Mr. Samft came back and said, you didn't see what you thought you saw, and then he quit, right? Yeah, yes. So that's what the jury can make any inferences from all of that. But I guess the question here—and I think this gets to a basic point—you know, I think my friend on the other side argued this case as though if they can show there was sufficient evidence from which Mr. Samft could have been convicted of a knowing violation, then there isn't materiality under Brady. But as this Court has said in Coring and Sedigatti and every other case, that's not the test. Even if there is sufficient evidence from which the jury could convict, the question is still whether there's a reasonable probability that the jury—and by that, the Supreme Court sent in Cohn—one juror might come to a different conclusion, such that you feel like the confidence in the verdict is undermined. So it's not a sufficiency test. And I do think—and I do want to make—I've got a couple more specific points, but the general point that my friend closed on, that the District Court saw this and the District Court made this conclusion about who to believe, of course—and about materiality and how it wasn't—you know, review under Brady of the question of prejudice and materiality is de novo. That's, you know, Coring, Sedigatti, every case says that. And, of course, in the three cases on which we rely, Sedigatti and Coring and Obagi, in each of those cases, the jury—the trial judge had found that the evidence should have been turned over, but wasn't, and then deemed it not material. And in each of those three cases on de novo review, the Court reversed. And the reason, I think, is because this is a—this—Brady goes to the fundamental fairness of the trial. It's an obligation that really can only be enforced by the judiciary in settings like this one. And so it's not a sufficiency to the evidence standard. It's an undermines confidence standard. And the Court has an obligation to apply de novo review to it. And if one applies de novo review, I mean, whatever one thinks about Henderson, remember, Lever, they described as a vital witness. Lever, they said, his testimony established—alone established Mr. Samph's knowledge. This is the thing. They told the jury that. They mentioned him 66 times in their closing. You know, we haven't talked about voucher— But you're well over your time. So if you'd just wrap up in the next 30 seconds, the Court would appreciate it. Well, his credibility was so important that they impermissibly vouched for the reasons we've explained in our brief. And the fact that they fought so hard after the trial was over, claiming that this evidence was irrelevant, evidence that they now say was a serious mistake not to turn over, they said at the time to us it was irrelevant and they weren't going to give it to us, and that they prepared an affidavit that turned out to be false with respect to what the contents of Mr. Lever's TV's application was. I think that tells you a whole lot about just how material the government thought this evidence was. Thank you. All right. Thank you both for your argument in this matter. This will be submitted.
judges: THOMAS, CALLAHAN, SANCHEZ